## Richmond.

CHESAPEAKE AND OHIO RAILWAY COMPANY V. HUNTER'S
ADMINISTRATOR.

January 11, 1917.

Absent, Prentis, J.*

1. DEMURRER TO THE EVIDENCE—*When Overruled.*—Where it appeared from the evidence that there were two aspects of the case in which the jury might have found for the plaintiff, it is not error for the court below to sustain the verdict of a jury and overrule defendant's demurrer to the evidence.

2. DEMURRER TO THE EVIDENCE—*Crossing—Collision.*—In an action to recover damages to an automobile caused by a collision with a freight train, drawn by two engines, at and upon a public railroad crossing, where it appeared from the evidence that the jury might have found that the engineer of the front engine, seeing the automobile stalled on the crossing half-mile away, applied the air brakes immediately, as he testified, and this was in ample time to stop the train, but for the neglect of the engineer of the second engine to shut off steam, or the jury might have disbelieved the testimony of the engineer of the front engine, because in conflict with the testimony for the plaintiff and the physical facts shown, it was not error to overrule the defendant's demurrer to the evidence.

3. EXPERT AND OPINION EVIDENCE—*Appeal and Error.*—Where there was no objection to the testimony of a witness on the ground of his incompetency to testify as an expert, the credibility and weight to be given his testimony are solely for the jury.

Error to a judgment of the Circuit Court of Rockbridge county, in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Submitted before Judge Prentis took his seat.

*J. M. Perry,* for the plaintiff in error.

*Curry & Curry* and *Timberlake & Nelson,* for the defendant in error.

Sims, J., delivered the opinion of the court.

Whittle and Kelly, JJ., concur in result.

This is an action by the appellee (plaintiff in the court below and hereinafter referred to as "plaintiff"), against the appellant (hereinafter referred to as "defendant"), for damages to an automobile belonging to W. S. Hunter, deceased, the plaintiff's intestate, caused by collision therewith of a freight train of the defendant at and upon a public road crossing of the defendant's main line of railway at Bell's Valley station in Rockbridge county.

Upon the trial of the case there was a demurrer to evidence by the defendant and a verdict of a jury in favor of the plaintiff for the sum of $500, with interest and costs, subject to such demurrer. The court below overruled the demurrer and entered judgment on the verdict in favor of the plaintiff. This action of such court is assigned as error here.

In the view we take of the case we need consider only one question, namely:

1. Was the defendant liable for said damages under the doctrine of the last clear chance?

As bearing on this question, the essential facts, ascertaining them under the rule applicable on demurrer to evidence, are as follows:

The automobile was being operated by the wife of the decedent, W. S. Hunter, when it came upon the railway track of the defendant. W. S. Hunter was seated on the front seat to the right side of his wife, with a child about four

years old in his lap. The automobile was a Maxwell, five passenger car, weighing about 3,000 pounds. The rear seat was occupied by Mrs. Daniels and Mrs. Via and two children, one of the ladies holding one of the children in her lap and the other child, about nine years old, was seated between these ladies. Mrs. Hunter, operating the automobile, was seated on the front seat on the left side. When the automobile was within a few feet of the crossing of the railway, an approaching train was first heard or seen by its occupants. It was then seen by Hunter, who cried out to his wife, "a train is coming." Thereupon she endeavored to stop the automobile before it ran upon the railway track, but failed to do so and did not succeed in stopping it until its front wheels passed over one rail—the south rail—of the track, and ran a little way towards the center of it. As the front wheels dropped over the rail, the engine of the automobile "went dead," was "killed" by the jar, and stopped, and the automobile, after exhausting its momentum and under the influence of the foot-brake, stopped in the position above indicated, partly on the railway track and partly off. There was an incline in the roadway at this point, because of which the rear wheels of the automobile were slightly lower than its front wheels as it stood after it stopped.

Whether the automobile stopped when it did because of the negligence of the plaintiff's intestate, or of Mrs. Hunter, his chauffeur, or of the defendant in failing to maintain the crossing in proper repair, or whether subsequently Hunter was guilty of negligence in remaining too long in a position of danger, trying to roll his automobile off the track, are immaterial, in the view we take of the case, so we need not refer to the testimony bearing especially on those questions, or to the authorities cited in argument bearing thereon.

When the automobile ran up on the track and stopped, Hunter, taking the child which had been in his lap with him, immediately sprang out of the automobile through its

front door on its right side; at the same time Mrs. Hunter and the two other ladies, taking the two other children with them, also immediately got out of the automobile. The train was then, according to Mrs. Hunter's testimony, "a long way off, * * * I judge about half a mile," approaching from the east going west, *i. e.*, facing the right side of the auto- mobile.

As he got out of the automobile and on getting out, Hunted, with his hat in one hand waved toward the train, put the child he had had in his lap down on the side-track 9.09 feet south of the south rail of the main railway track, came back on the main track in front of the automobile, and facing the train, with his hands and arms upraised, with his hat in one hand, gave the "shut-off" or "stop signal" used by and well known to railroad men, and directed Mrs. Via to wave her red garment (supposed to be a red scarf or sweater) across the track. Hunter then tried to crank the automobile but failed to start its engine.

The railway track from the crossing east was perfectly straight and the engineer and fireman of the approaching train had a full and unobstructed view of the crossing for a mile distance east of it. It was a clear day and in broad daylight when the accident happened. The train was a "double-header," that is, pulled by two large locomotives or engines. The train consisted of 35 cars besides the two engines, composed of 30 cars loaded with cement of 50 tons each, 4 empty steel coal cars, and the caboose.

There was a "hump" or "rise" in the railway track east of the crossing in question, located on the blue print filed by defendant with the record about 2142 feet east of such crossing. This place in the track was plainly discernible to any one looking along the track eastward from said crossing or from the depot platform on the north of the track, also east of the crossing.

The grade of the railway track from the "hump" or "rise" to the crossing was slightly down grade. The train approached the crossing from the "hump" or "rise" at a speed of 30 to 35 miles and hour, until its speed was checked by the air brakes, and was going at a rate of 18 to 20 miles an hour when it struck the automobile.

Luck, a witness for plaintiff, who was on the depot platform when the automobile came upon and stopped on the railway track at the crossing, testified that he saw the automobile when it stopped, looked toward the approaching train and that the train was then *"beyond* the rise," on the east side of the "rise"—that is, it was then more than 2142 feet away, according to the measured distance of such rise, as shown on said blue print. Luck stated this distance as 9 rails from the crossing to the point on the platform where he was, and 66 rails from him to the "hump" or "rise" in the track, as per his counting of the rails the next day after the accident, when he was giving the claim agent of defendant information asked by latter of him on the subject, making the train then more than 2250 feet away from the crossing (a rail being 30 feet long), according to Luck's testimony.

Luck further testified that when Hunter had waved the shut-off or stop signal and then tried to crank his automobile, he (Luck) then looked towards the train a second time and that the train was then "still beyond the rise," or more than 2142 feet, per said blue print, or more than 2250 feet per Luck's rail count, or about half a mile away from the crossing and from the automobile stalled on the track.

The testimony of plaintiff as to what then ensued is that Hunter, after trying and failing to crank his automobile, waved his hat at the approaching train again (as Mrs. Hunter testified), that he called for help to "try to push the car backwards off the track," told Mrs. Hunter to take hold of the left front wheel, which she did, and he

took hold of the right front wheel and put his shoulder against the front of the automobile and they pushed the automobile back until its front wheels came against the south rail of the railway track when it stopped and they could push it no farther. Hunter then cried out, "Get out of the way." The front engine of the train was then "beyond the switch," or a little east of the switch, according to Luck, the switch being about 735 feet east of the crossing according to said blue print.

When Hunter cried "Get out of the way," his wife left the wheel she was trying to roll over the railway rail and made her escape from the railway track by running back south of such track. Hunter at the same time tried to make his escape, but found one of his feet caught between the guard rail and the south rail of the track, whereupon, leaning on the front of the fender over the front wheel of the automobile which he had been trying to roll, with his left side towards the approaching train, his back north—very nearly the same position as that in which he had been ever since he tried to crank the automobile and failed and attempted to roll the automobile off the track—he struggled to free his foot, which held him fast. Not seeing her husband when she reached a place of safety, Mrs. Hunter ran around the rear of the automobile in search of him and seeing him in the position mentioned with his foot caught, as stated, she started to go to his rescue, when she tripped over a rail of the side-track and fell. Before she could recover her footing she saw her husband get his foot loose, as the front engine of the train was almost upon him and at that instant she saw him leap backwards and toward the north side of the track. She thought he had escaped but the engine struck him on his left side, threw him some ten or twelve feet high and some eighty feet distant west of the crossing to the north side of the track, killing him instantly, and struck the automobile at the same time and threw it to the south

side of the track about eighty feet west of the crossing, practically demolishing it.

The red garment was meanwhile being waved by Mrs. Via, standing on the side-track, south of where Hunter was, from the time he told her to wave it until the front engine of the train was within about 180 feet of the automobile and Hunter.

It will be observed that when the automobile stopped upon the track, and its chauffeur and all its passengers were leaving, or had left it, and Hunter gave the stop signal to the approaching train, the automobile being a large car of some 3,000 pounds weight, it was in itself obviously a dangerous obstruction on the track; and it was clearly the duty of the defendant, after it was seen by the engineer or fireman of the front engine of the train, to use every reasonable effort to stop the train or bring it under such control as to be able to stop it before it should reach the automobile, unless the latter was removed from the track before the train reached it. Such effort, as shown by the testimony of the said engineer and fireman themselves, would have included in the situation and under the circumstances thus presented the shutting off of the steam from the engine, the putting on of the air brakes, the sanding of the track as soon as could reasonably be done after such engineer or fireman saw the automobile on the track, and also the shutting off of the steam from the second engine as soon after its engineer felt the air brakes had been put on as could reasonably be done.

As the learned judge of the court below says in his opinion given following the first trial of the case of *L. E. Hicks, Admr. of W. S. Hunter* v. *C. & O. Ry. Co.*, argued before this court along with the case we are now considering, in reference to the signal of Hunter to the engineer to stop, "That was notice to him that the automobile was on the track and might be destroyed * * *" As the same learned

89

judge says in his opinion given following the second trial of the case of *L. E. Hicks, Admr.*, v. *C. & O. Ry. Co.*, next above referred to, "The evidence of the plaintiff is that Hunter immediately signaled the approaching train to stop and that at the time he so signaled it, there was yet time for it to have done so and have avoided the accident altogether."

At no time after the automobile stopped on the track did its obvious situation change as to its being a dangerous obstruction on the track until it was struck by the train. That it was such an obstruction and called for immediate efforts on his part, such as above stated as being included within the duty of the defendant towards stopping or getting the train under control, was recognized and acted upon by Hinebaugh, the engineer of the front engine, as he says in his testimony, *immediately* upon his seeing the automobile on the track at the crossing and its passengers jumping out.   He admits that he saw it at the point of time when its passengers were jumping out and says that he *immediately* applied the air brakes, sanded the track, began to sound the danger signal of quickly successive short blasts of the whistle.   On these subjects he testifies as follows:

"* * * I saw an obstruction on the track and I stuck my head out of the window to take a good look and saw it was some kind of vehicle on the track; I didn't know whether it was a car, buggy or what it was when I first saw it, only I saw the passengers jumping out all around the car."

"Q. Were the people you saw jumping out of the car? A. Yes, sir, they were jumping out of the car when I saw them.

"Q. What did you do? A. I applied my brake in the emergency immediately and began to sound the danger signal. * * *

"Q. As I understand you, then, as you turned around you saw a vehicle on the track? A. Yes, sir.

"Q. And as you saw it you saw people getting out of it? A. Yes, sir.

"Q. You at once applied the emergency? A. I applied the emergency brake just as quick as I could; it was right at my side and it only takes a thought to apply it.

"Q. Then what did you do after putting that emergency on? A. I began to sound the danger signal.

"Q. What is the danger signal? A. Successive short blasts of the whistle.

"Q. Go ahead and tell what occurred. A. I saw the gentleman come around the end of the car and he walked out near the north rail and gave me a signal just like this (illustrating) just one time.

"Q. The man there at the car, then, gave you a signal: what did that signal mean? A. It was a stop signal.

"Q. Did you see anybody else waving to you? A. No, sir; my attention was attracted absolutely to that man for I saw the dangerous position; immediately after giving that signal he dropped down in front of the car, placed his shoulder against the front of his car to push it off the track, and my attention was attracted to him from that on; he was a man absolutely in danger.

"Q. What else did you do on that engine in order to stop? A. Applied the brake and opened the sand was the only possible thing I could do.   *   *   *

"Q. Had you cut off or not? A. I shut off.

"Q. When did you shut off? A. When I first saw the obstruction.

"Q. After you first put on the emergency or afterwards? A. I shut off first.

"Q. What is your usual order of putting on your emergency brake or air; do you shut off first and put on the air

afterwards?  A. Yes, sir; shut the steam off and then apply the brakes.

"Q. So, as you went down there you were without steam, you had your emergency on, and you were sanding the track?  A. Yes, sir."

Fultz, the fireman of the front engine, says in his testimony on this subject as follows:

"Q. Where were you when you first came in sight of the crossing; I mean where were you sitting?  A. On my seat box on the left side.

"Q. What were you doing?  A. I was looking ahead.

"Q. Did you see these people on the track before Mr. Hunter was struck?  A. Yes, sir. * * *

"Q. What did you see when you first saw them, did you see them when they came on the track?  A. Yes, sir, I seen them when the car run up and stopped. * * *

"Q. You saw the car stop?  A. Yes, sir.

"Q. Then what happened?  A. Well, it seemed like the ladies or women was jumping out, and it seemed like they threw wraps out or something like that, red, looked like they were thrown up in the air; I seen the ladies get out of the car and also seen one man get out of the car.

"Q. What did you do in the meantime?  A. Well, as soon as I seen this I started to holler to the engineer.

"Q. Where was he?  A. He was on the seat box, and just as I fixed to holler he threw his brakes in emergency; of course, the brake valve makes quite a fuss; I knew there was no use to holler as soon as I hear him throw the brake in emergency, I knew there was no use, he seen them.  I seen him raise up in his seat box and look out ahead, and I raised off my seat box and began ringing the bell; I never said a word to him; I knew he did all he could when he threw the brake valve in emergency. * * *

"Q. What happened, now, from the time this emergency went on on to the end of the business?  A. Well, the ladies

jumped out of the car; they went this way (indicating) and the man went the other way, went over and looked as if he was pushing at the car to get off the track; he pushed at it a short while and run in between the wheels of the car, and I supposed he was taking the brake off; I was standing there ringing the bell living in hopes he would get the car off; after he run in between the wheels and did a little something in there, he didn't stay but an instant, just so quick, you know, you could hardly know he had been there, he ran around and got against the car in the front end and began pushing just like that; it looked as though he had just got it started the last glimpse I got of him; of course, I couldn't see Mr. Hunter when he was hit at all, but we were close as from here to the door the last time I seen Mr. Hunter.

"Court: What was he doing at that time? A. Looked like he was down pushing against the head or fender, something like that; he was crouching over in that position, looked as if he was trying to push the car off; I thought he had the car off. * * *"

CROSS-EXAMINATION.

By Mr. Timberlake:

"Q. Did you maintain a lookout for that crossing as you approached it? A. Yes, sir.

"Q. You maintained a constant lookout? A. Yes, sir.

"Q. Now, you can see that crossing for a distance of about a mile, couldn't you? A. Yes, sir; every bit of it.

"Q. And if you had seen an automobile stalled on that crossing with people getting out of it you would have regarded that as an immediate notice of danger which would have required you to stop? A. Sure.

"Q. That would have presented a condition of affairs to you that showed you the necessity of stopping? A. Sure.

"Q. And you tell the jury now that you maintained an uninterrupted lookout from the time you first came in sight of this crossing until this accident occurred?   A. Yes, sir.   *  *  *

"Q. You saw the red scarf or garment thrown up?   A. Yes, sir.

"Q. And you saw people standing around the car?   A. I saw them getting out of the car."

The testimony for the defendant was that the train could and should have been stopped on this occasion, and its witnesses claimed that it was in fact stopped, 1200 feet from the point at which the air brakes were put on.

A witness for plaintiff testified that the train could have been stopped within 800 to 900 feet from the point at which the air brakes were put on, but the learned judge of the court below held that the testimony of this witness must be disregarded because he based his testimony on only one instance in his experience when conditions did not approximate those existing in the case at bar, and further because such testimony was in conflict with the known laws of physics.  Without passing upon the correctness of this holding, we will disregard the testimony of this witness in the case and consider the fact to be that the train could and should have been stopped within 1200 feet of the point at which the air brakes were put on, if the engineers of the front and second engines exercised reasonable care and diligence in their efforts to stop the train thereafter.

Concerning the question as to whether such reasonable care and diligence were exercised by the engineer of the second engine, there is a conflict between the testimony for the plaintiff and for the defendant.  This conflict is in regard to when the steam was shut off from the second engine.

Phillip Moore, a witness for plaintiff, testified as follows:

"DIRECT EXAMINATION.

By Mr. Curry:

"Q. Mr. Moore, where do you live?  A. I live at the old stone quarry at Bell's Valley.

"Q. How far do you live from the railroad?  A. Something about 250 yards, something like that.

"Q. On the south or north side of the track?  A. On the south side of the track.

"Q. On the southeastern side, I believe, is it?  A. Yes, sir, the southeastern side of the track.

"Q. What is your occupation?  A. Engineer.

"Q. How long have you been an engineer?  A. All my lifetime.

"Q. You are a stationary engineer?  A. Yes, sir.

"Q. You have been running engines all your life?  A. All my lifetime been around engines.

"Q. You have worked, then, on railroads, too?  A. Yes, sir, some.

"Q. What did you do on the railroad?  A. Firing.

"Q. Are you familiar with the working and running of engines?  A. Very much so.

"Q. Can you stand off and look at an engine and say whether it is in power or not?  A. Yes, sir.

"Q. A locomotive running on the track?  A. Yes, sir.

"Q. Can you tell whether the steam is on or not?  A. Very likely, yes, sir.

"Q. Well, is there any doubt about you being able to tell it?  A. No, there is no doubt about it that my eyes would deceive me that much that I couldn't tell.

"Q. Now, do you know about the time, or the time Mr. Hunter was killed at Bell's Valley?  A. The 27th day of September.

"Q. What year?  A. 1914.

"Q. Was it Sunday or what day?  A. Sunday.

"Q. Did you see him when he was struck? A. No, sir.

"Q. Did you see the train when it passed the point where he was killed? A. I seen it after it passed the point.

"Q. How many engines were there, more than one engine to the train? A. There was two.

"Q. Where did you first see the engine? A. When it passed the crossing a piece.

"Q. Where were you when you saw it? A. I was over there close to my house.

"Q. Now where is that with reference to the crossing? A. Well, that would be just about southeast just as near as I could tell you, and about 250 yards from the railroad.

"Q. Then, you were on the lower side as we generally speak of it going west? A. Yes, sir.

"Q. Do you know whether the engines, after they passed that crossing, or when they passed that crossing, were cut off? A. The front engine was cut off, shut down entirely, but the second engine wasn't.

"Q. How do you know that? A. I could tell by the moving of the engine, by the smoke and the sound of the exhaust.

"Q. And the sound of the exhaust? A. Yes, sir.

"Q. Was it cut off at all? A. The second one?

"Q. Yes. A. No, sir, he was working at full power.

"Q. How far did it go? A. Well, as near as I could tell along about four or five or six rails, something like that.

"Q. After it passed the crossing? A. After it passed the crossing.

"Q. Did you see the accident? A. No, sir.

"Q. You were not in a place to see that? A. No, sir, I wasn't in place to see that.

"Q. How did you happen to notice that the front engine was cut off and the second wasn't? A. After the danger whistle was blowed I knew there was something up and I come up to the hill there where I could see across and I made up my mind if they done anything they will certainly

shut down, and I made it strictly a point to look at the engines when they passed me to see whether they were both shut off or not and I looked and seen the first one shut off and the second still working for a piece and finally shut off too.

"Q. And he shut off about how many rails after he passed the crossing? A. Four or five or six; it was done so quick I couldn't tell exactly."

CROSS-EXAMINATION.

By Mr. Perry:

"Q. You say you have worked with engines all your life? A. Yes, sir.

"Q. What has been your experience with engines? A. Well, I have run engines.

"Q. On what road? A. I haven't run any on the road.

"Q. You have never run a railroad engine? A. I have fired.

"Q. You fired a railroad engine when? A. About twenty-five years ago.

"Q. On what road? A. C. H. & D.

"Q. That is the Cincinnati, Hamilton and Dayton? A. Yes, sir.

"Q. How long did you fire for them? A. I should judge something along about close on to a year.

"Q. Twenty-five years ago? A. Yes, sir.

"Q. Now how is it you tell whether an engine is cut off or not? A. When I was looking at it I could see the engine was working; you could tell by the exhaust, by the smoke coming out of the stack and by the sound of the exhaust.

"Q. What makes you say, then, this second engine was not shut off is the fact that you could see smoke coming out as if it was being exhausted? A. You could hear the exhaust too.

90

"Q. You could hear the exhaust? A. Yes, sir.

"Q. What could you see about the steam? A. You can tell by the working of the steam passing out through the stack whether the engine was pulling.

"Q. You could hear it puffing, could you? A. Yes, sir.

"Q. Do you mean to say you heard the engine puffing? A. Yes, sir.

"Q. Do you know whether the engine was reversed? A. Very likely he wouldn't exhaust by being reversed.

"Q. Why not? A. He might have, but it didn't look to me like it was.

"Q. The exhaust runs one way just the same as the other, and don't you know that? A. No, I don't know.

"Q. Don't your engine exhaust in exactly the same way whether you are going backwards or forwards, isn't the whole thing worked, and the motion of the pistons, precisely the same whether the engine is going backwards or forwards; isn't that a fact? A. Yes, yes, so far as the works is concerned.

"Q. So, so far as you know, the exhaust you saw that evening might just as well have been from a reversed engine as from an engine going forward? A. Yes; it was too far up for me to tell, but I thought he was pulling.

"Q. You thought he was pulling because it was a good piece away from you and he was going fast? A. Yes, the engine was working, that is all I could tell you, the engine was working one way or the other.

"Q. Do you know anything about a mechanical stoker? A. I haven't run any of them.

"Q. You don't know whether these engines had mechanical stokers on or not? A. I didn't pay any attention to the stokers.

"Q. You don't know whether that engine had a stoker or not? A. No, sir.

"Q. You don't know whether the stoker was running or not? A. It don't throw smoke out like it would if the engine was working.

"Q. How far to the southeast of this road crossing is your house where you were? A. I was just about 250 yards from the railroad crossing.

"Q. You were 250 yards southeast of the railroad crossing? A. Yes, sir.

"Q. And this train was going west? A. Yes, sir.

"Q. And you didn't see the train until just after it passed the crossing? A. I didn't pay no attention to it, didn't know there was anything about it until I heard the danger whistle.

"Q. You heard the danger whistle? A. Yes, sir.

"Q. Blowing a right smart? A. Yes, sir.

"Q. You were behind the house when you heard it? A. No, sir, in front of it.

"Q. How far did you run in order to see what was happening? A. The length of this room here.

"Q. That is about 45 feet? A. Something like that.

"Q. Right towards the railroad? A. Yes, sir.

"Q. Did you get 45 feet nearer the crossing by running that way? A. Yes, sir.

"Q. And when you got to that point you could see the engine just passing the crossing; is that right? A. Yes, sir; he was a little past the crossing before I seen it; he was just a little bit past the crossing when I got there.

"Q. That is, the first and second engines? A. Yes, sir.

"Q. And from that you concluded the engine had power on? A. Yes, and by the sound of the exhaust.

"Q. And by the sound of the exhaust? A. Yes, sir.

"Q. Now, what other signs were there? A. That is about all.

"Q. That and the speed? A. Yes, sir.

"Q. Yet, you have already said you couldn't tell whether the power was on in reverse or forward motion? A. The engine was in working order one way or the other, forwards or back.

"Q. He stopped very quickly after that, didn't he? A. About four or five rails, something like that; he quit throwing out the smoke and exhaust.

"Q. You saw Mr. Hunter after he was killed? A. Yes, sir.

"Q. Did you look at all at his injuries? A. Well, now, I didn't pay much attention to his injuries, but I was the man that partly took care of him when he was there; I laid him down, kind of put his feet together and his arms.

### Re-Direct Examination.

By Mr. Curry:

"Q. Now, was that second engine running like the first engine or differently? A. Oh, yes, he was pulling, he was working.

"Q. Now, were the wheels running backwards and catching, or were they running forwards? A. They looked to me like they were running forwards.

"Q. Now, when an engine is reversed, why they run the wheels backwards and catch and skid, don't they?

"(Objection.)

"Court: Just tell how the drivers were moving. A. As near as I could tell the engine was in full working order and was running forwards.

"Q. We asked you how the drivers move when an engine is reversed? A. They run backwards, they work back action, they work against the engine then.

"Mr. Curry: These were not running backwards. A. It didn't look to me like they were running backwards.

"Court: Could you see them to tell? A. It looked to me like the drive rods were running in the same direction, I was watching the driving rods on the side.

"Mr. Timberlake: The only difference between the two engines was the front was cut off and the other was not. A. He was cut off, but the second wasn't, the second was pulling.

"Q. Is that a matter that can be readily seen by anybody looking at the engine, very easily told? A. Very easily; it can be seen.

"Mr. Perry: Q. How do you know she was pulling? A. Well, I couldn't see any way but what she would be pulling.

"Q. You come back to the same thing, that you saw the exhaust and heard the exhaust, and therefore think she was pulling? A. Yes, sir; and while I was watching the engine the driving rods looked like they were working in the same direction.

"Q. You couldn't see the spokes in the wheels? A. No, sir.

"Q. Don't the driving rods go in exactly the same direction whether the engine is going forward or backwards? (No response.)

"Mr. Perry: Stand aside."

The testimony in the case shows that as a matter of fact the second engine *was not reversed*—so that did not explain the appearance of exhaust testified to by Moore.

In regard to the testimony of Moore, the learned judge of the court below says in his opinion after the first trial of the case of *L. E. Hicks, Admr.,* v. *C. & O. Ry. Co.,* above referred to: "Mr. Philip Moore in direct examination says that the power was not cut off of the second engine promptly, but his cross-examination shows that he has no sufficient reason for this statement."

In the opinion above mentioned, after the second trial of the case just referred to, the same learned judge on the subject of this testimony of Moore says:

"It is also said that the railroad was negligent in that the power from the second engine was not cut off; indeed, that it was not cut off until that engine was four, five, or six rail lengths beyond the crossing (p. 88). At page 93 the witness was asked:

" 'Q. How do you know she was pulling? A. Well, I could not see any way but what she would be pulling.

" 'Q. You come back to the same thing, that you saw the exhaust and heard the exhaust, and therefore think she was pulling? A. Yes, sir, and while I was watching the engine the driving rods looked like they were working in the same direction.

" 'Q. You could not see the spokes in the wheel? A. No, sir.

" 'Q. Don't the driving rods go in exactly the same direction whether the engine is going forward or backward? (No response.)'

"A very rapid exhaust does show that a locomotive is pulling, but frequently there is an exhaust from an engine when the train is standing still, due, it is believed, to some manipulation of the air, but however that may be, this fact remains and is one of common knowledge, and the sound is the same, but does not approach that of an engine pulling hard up grade.

"But if we assume that this evidence on demurrer is sufficient to show that the power of the second engine was not cut off, yet the fact remains that this engineer never saw nor could see Hunter. His view was cut off by the front engine. And if he had seen him he was entitled to the same presumption that the engineer of the first engine was, namely, that Hunter would remove himself from his place of peril in ample time.

"But whether the power from the second engine was cut off or not, the emergency brakes had been applied to it, and there is nothing to show the propelling power of an engine independent of its momentum in such circumstances.

"As a matter of fact, did the train stop with a due promptness when the emergency brakes were applied? The defendant's evidence shows that it did—that a good stop was made."

As was said by this court in the case of *Arminius Chemical Co.* v. *Landrum,* 113 Va. 7, at page 21, 73 S. E. 459, at page 466 (38 L. R. A. [N. S.] 272, Ann. Cas. 1913-D, 1075). in regard to the testimony of Maury, so we say in regard to the testimony of Moore in the case now before us: "* * * we cannot say that it clearly appears that he was not a competent witness * * *"

There was no objection to the testimony of Moore in the case now before us on the ground of his incompetency to testify as an expert; therefore, the credibility and weight to be given his testimony was solely for the jury. The jury may have drawn a different conclusion from this evidence from that drawn by the trial judge, or by us had we been upon the jury.

Grove, the engineer of the second engine, a witness for the defendant, testified that he knew the moment the front engineer put on the air brakes, and that he shut off the steam from the second engine "not very far" after that. Now, under the rule applicable as on demurrer to evidence, the testimony of Grove must be disregarded on this point because in conflict with that of Moore and the jury might have found, if they believed the testimony of Moore to be correct, that the second engine was not shut off promptly following the putting on of the air brakes, but that such engine was pulling under a full head of steam until after the front engine had struck the automobile and passed the crossing from five to six rails, or from 120 to 180 feet. We

cannot agree with the trial judge that the absence of express evidence as to the effect of the non-shutting off of the second engine leaves the case as if the second engine had been promptly shut off. It seems to us that the known laws of physics must of necessity have been in operation in such a situation and the stopping power of the air brakes upon the train must have been neutralized precisely to the extent of the pulling power of the second engine. That power was one-half of the power which pulled this heavy train and hence must have been tremendous. Knowledge of precisely what such power was and its effect upon the braking power of the air brakes, so as to neutralize the effect of the latter and to what extent it would neutralize such effect, was peculiarly within the knowledge and in the possession of the defendant, and as it introduced no evidence on the subject, we cannot say that the jury were not warranted in finding that it had a great effect in delaying the stopping of the train after the air brakes were put on (see *Goodman* v. *Richmond &c. R. Co.*, 81 Va. 576; *Copperthite* v. *Loudoun Nat. Bank,* 111 Va. 70, 68 S. E. 392, as to principle referred to) ; and if they believed from the evidence for the plaintiff that the train was approximately half a mile or 2640 feet away when the automobile first came on the track, and that it was approximately 2250 feet away when the front engineer saw and realized the situation, and if they believed from the front engineer's testimony that he then put on the air brakes, the jury may have disregarded that part of the testimony of such engineer which related to the location of the train on the track when he put on the air brakes, as in conflict with his own testimony that he put on such brakes immediately following the jumping out of its passengers from the automobile, and have believed that the front engineer in fact put on the air brakes when the train was some 2250 feet from the crossing, or if not that precise distance at a sufficient distance to have stopped the train be-

fore it reached the crossing; and that the neglect of the engineer of the second engine to shut off the engine promptly after the air brakes went on, and the consequent pulling of the second engine under a full head of steam, with the track sanded as it was, until the front engine had struck the automobile and passed the crossing 120 to 160 feet, delayed the stopping of the train and was the proximate cause of the accident. If the jury might have so believed from the evidence and absence of evidence peculiarly within the power of the defendant to produce, the court below should have so held, and this court must so hold. *Citizens Bank* v. *Taylor*, 104 Va. 164, 51 S. E. 159; *Richmond City* v. *Barry*, 109 Va. 274, 63 S. E. 1074, and other cases of this court on this point.

There is practically no conflict between the testimony for the plaintiff and defendant as to what occurred at the crossing after the automobile came on and stopped upon the track; and there is no conflict between such evidence as to the fact that the defendant's servant, the engineer of the front engine, saw the automobile on the track as soon as he reasonably could have seen it, that is, the instant after it stopped and while its passengers were yet getting out of it, and correctly apprehended the situation on the crossing at once and acted immediately as he should have acted; nor is there any conflict between such evidence as to the fact that the fireman of the front engine saw the automobile the very instant it came on the track, and that before he could call out to the engineer of such engine the latter had put on the air brakes, etc. It is not claimed or suggested in the testimony of such engineer or fireman that they or either of them acted upon any expectation that the automobile would be removed from the crossing before the train reached it, unless the latter was stopped, or that a collision could have been avoided save only by stopping the train. On the contrary they both testified that it was a case as they saw it

from the time the automobile stopped on the track, on to the end of the tragedy, for the utmost effort on the part of defendant to stop the train before it reached the automobile, and that from the very instant of time that the automobile had stopped and its passengers were jumping out, the brakes were put on, the track then sanded, etc. Now, if this had been done when the train was approximately half a mile away from the crossing, or 2250 feet, or 2142 feet, or more than 1200 feet away, the preponderance of evidence is clearly that the train would have been stopped before the collision with the automobile, if the second engine had been shut off when its engineer testified it was.

There is a conflict of evidence on the question of fact, which is the turning point in the case, as to how far away the approaching train was when the automobile stood on the crossing with its occupants jumping out, or out of it, and Hunter was giving the stop signal.

The testimony for the plaintiff on this point has been noticed above, to the effect that the train was at least more than 2142 feet, or nearly half a mile, away from the crossing at this turning point of time or distance in the case.

The testimony of two witnesses for the defendant, Mrs. Clayton and Miss Burke, corroborates that for the plaintiff as to the distance the train was away when the automobile stopped on the track and the passengers were jumping out, when considered in connection with the testimony of a number of witnesses for defendant as to the blowing of a single long blow for the station, next two blasts of the whistle for the crossing, and next the danger signal of frequent short blasts. The engineer of the front engine and its fireman and several other witnesses for defendant testify that the whistle for the station was blown at the station whistle board or post, which the evidence shows was "a little less than half a mile from the station," and hence was about a half mile east of the crossing. Mrs. Clayton and Miss

Burke both testify that while they were not in sight of the train they were of the automobile when it stopped and its passengers were jumping out, and that at that instant of time they heard the single long blast of the whistle, and *afterwards* the two blasts for the crossing, and *after that* the danger signal; and that upon hearing the first long whistle one thought "they will be killed" and the other remarked, "It has stopped on the track and the train is coming," which fixed the time of their hearing this long blast, and fixed the time that the fireman saw the automobile come on the track, as the time when such long blast was blown, and the time when the engineer of the front engine put on the air brakes, as immediately following the long blast of the whistle, which in turn fixed the location of the train when the air brakes were put on at approximately half a mile away from the crossing.

The remaining testimony in the case as to when the air brakes were put on is that of the two witnesses, the engineer and fireman of the front engine, Grove the engineer of the second engine, and Goodbar, a brakeman; all of whom testified that the air brakes were put on just about the east switch, or a little east of the east switch, which is 735 feet east of the said crossing, and the engineer and fireman of the front engine fix this as the location of the train on the track when they first saw the automobile. Such testimony of such engineer and fireman was in conflict with their own testimony, as above noted. All of such testimony was also in conflict with the inference which might fairly be drawn from the testimony for plaintiff as to the distance the train was away when the automobile stood on the track, at the time when said engineer and fireman admit they first saw it, and when they say the air brakes were put on—hence, it must be disregarded upon demurrer to evidence. Therefore—

The jury may have found that the seeing of the automobile and its situation on the track at the crossing by the engineer of the front engine was just when the passengers were jumping out of it, as he himself testified, and that he put on the air brakes immediately, as he testified, when the train was approximately half a mile away, and that this was in ample time to stop the train so as to prevent the collision and would have prevented it but for the neglect of the engineer of the second engine to shut it off, or the jury may have disbelieved the testimony for the defendant, that the air brakes were put on, the track sanded, etc., immediately following the seeing of the automobile in the situation above noted by said engineer and fireman of the front engine, because in conflict with the testimony for the plaintiff, the physical facts shown thereby and the inference fairly to be drawn therefrom that if this had been done it would have been done when the train was approximately half a mile away and the train would have stopped before reaching the crossing, and have yet believed the testimony for defendant of the said engineer and fireman, that they saw the automobile at the period of time when it was in the situation aforesaid, which was not in conflict, but in accord with the testimony for plaintiff, and testimony of Mrs. Clayton and Miss Burks for defendant.

Hence, there are two aspects of the case in which the jury might have found for the plaintiff. In either aspect the court below was right in sustaining the verdict of the jury and overruling the demurrer to evidence.

We, therefore, find no error in the judgment complained of and it will be affirmed.

Whittle and Kelly, J. J., concur in result.

*Affirmed.*